# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-0232V
Filed: July 12, 2019

| | |
|---|---|
| VICTORIA LEMING and KEVIN LEMING, Parents and Natural Guardians of A.L., a Minor,<br><br>       Petitioners,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>       Respondent. | Finding of Fact; Surgical Intervention; Bone Marrow Aspiration; Special Processing Unit ("SPU") |

*Robert Joel Krakow*, Law Office of Robert J. Krakow, P.C. New York, NY, for petitioner.
*Brittany Alexandra Anne Ditto*, U.S. Department of Justice, Washington, DC, for respondent.

## RULING ON FACTS[1]

On February 14, 2018, Victoria and Kevin Leming ("petitioners") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act" or "Program"), on behalf of their minor daughter, A.L. The petition alleges that a measles-mumps-rubella-varicella ("MMRV"), a diphtheria-tetanus-acellular pertussis ("DTaP"), and/or a Haemophilus influenzae type b ("Hib") vaccine that A.L. received on September 6, 2016, caused her to suffer from immune thrombocytopenic purpura ("ITP"), immune dysfunction, and immunodeficiency. Petition at 1. The case was assigned to the Special Processing Unit ("SPU").

---

[1] The undersigned intends to post this ruling on the United States Court of Federal Claims' website. **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished ruling contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.

**I.      Procedural History**

In support of the petition, petitioners filed medical records and declaration. ECF Nos. 5 & 6 (Exs. 1-10 (medical records), and 11 (Declaration of Victoria Leming)). An initial status conference was held on March 28, 2018. Following the conference, respondent was ordered to provide his position in the case indicating whether he was amenable to settlement. Order, ECF. No. 10. At respondent's request, petitioners filed additional medical records (ECF Nos. 19 & 24 (Exs. 12 &13)). Petitioners also filed additional declarations (ECF No. 25 (Ex. 14 (Declaration of Trisha Prewitt), ECF No. 15 (Second Declaration of Victoria Leming)).

Respondent filed his Rule 4(c) report on December 21, 2018, contesting petitioners' claim to vaccine injury compensation. Resp. Rep., ECF No. 34. In it, respondent states that petitioners have not established by preponderant evidence that A.L. either:

> [Suffered] the residual effects or complications of a vaccine-related injury for more than six months after the administration of the vaccine . . . or alternatively, that [A.L.'s] injury resulted in inpatient hospitalization and surgical intervention.

Resp. Rep. at 5 (citing 42 U.S.C. § 300aa-11(c)(1)(D)(i), (iii)). In support of this position, respondent argues that A.L.'s inpatient bone marrow aspiration procedure, like the lumbar puncture procedure discussed in *Spooner*, does not constitute a "surgical intervention" under the Vaccine Act. *Id.* (citing *Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at *10-13 (Fed. Cl. Spec. Mstr., Jan. 16, 2014))*.

Following the filing of respondent's report, a status conference was held on February 14, 2019 to discuss future proceedings. ECF No. 35. During the conference, petitioners' counsel posited that the facts of A.L.'s case more closely tracked those in *Ivanchuk v. Sec'y of Health & Human Servs.*, No. 15-357V, 2015 WL 6157016, at *2 (Fed. Cl. Spec. Mstr., Sept. 18, 2015) (bone marrow aspiration can qualify as a "surgical intervention" under the Vaccine Act).

Acknowledging this dispute, the undersigned deemed it appropriate to proceed with a fact ruling to resolve whether petitioners' claim meets the statutory severity requirement. Order, ECF No. 35. A schedule for briefing was set. *Id.*

Prior to filing their motion for fact ruling, petitioners filed additional medical records. ECF No. 36 (Ex. 16), ECF No. 37 (Ex. 17). The parties filed concurrent motions for fact ruling on March 26, 2019. ECF Nos. 38 (Resp. Mot.) & 39 (Pet'rs' Mot.). Attached to their motion, petitioners provided three additional exhibits (Exs. 18-20). Responsive briefing was not scheduled. The matter is now ripe.

## II.     Factual History

The undersigned has reviewed all the records in this case as well as respondent's Rule 4(c) report and the parties' motions for ruling. The undersigned finds that the recitation of facts in the Rule 4(c) report is accurate and is set forth below for the purpose of providing a history for this Ruling.

A.L. was born on May 26, 2015.  Ex. 8 at 10.  On the day of her birth, she was briefly transferred to the NICU for hypoglycemia that resolved the same day.  *Id.* at 7-9.  In her first 15 months, her medical history is significant only for ear infections that required bilateral tube placements.  Ex. 5 at 6; Ex. 1 at 48.  She had no complications following tube placement.  Ex. 5 at 3.

On September 6, 2016, A.L. was seen for her 15 month well visit.  Her exam was normal, and she received DTaP, Hib, and MMRV vaccinations.  Ex. 1 at 37-39.  On September 16, 2016, 10 days post-vaccination, A.L.'s mother called her pediatrician to report that A.L. developed a rash and fever three days prior.  Ex. 13 at 3.  The fever had resolved, but the rash, described as raised and blotchy, remained.  *Id.*  Her mother did not report bruises and stated that A.L. was sleeping, eating, and drinking well.  *Id.*  She was told that it was likely viral roseola and that no treatment was needed.  Ex. 8 at 214.

On September 29, 2016, 23 days after vaccination, A.L presented to the emergency room with a rash, bleeding gums, and black spots on her tongue.  Ex. 8 at 209.  An exam showed scattered bruising, a generalized petechial rash, and a low platelet count.[3]  *Id.* at 212-218.  A.L. was admitted, and after receiving one dose of IVIG, she showed increased bruising and was transferred to Children's Hospital in Omaha on September 30, 2016.  *Id.* at 225, 283.  Upon admission to Children's Hospital, A.L.'s mother stated that she had bruising and bleeding for one week prior.  Ex. 4 at 7-11.  A.L. was given a second dose of IVIG and again showed no improvement.  *Id.* at 16.  During a hematology consultation, A.L.'s mother reported that A.L. had a fever of 102.7 degrees and a rash in the week following the vaccine.  *Id.* at 19-22.  A bone marrow aspiration and biopsy ruled out cancer and other blood cell disorders.  *Id.* at 80-81, 111, 117.  A.L. was treated with IV steroids and her platelet counts improved.  *Id.* at 4.  She was discharged on October 12, 2016.  *Id.* at 3-5.

In follow-up with her hematologist on December 30, 2016 (three months and 24 days post-vaccination), it was noted that A.L. was receiving no further therapy; was asymptomatic; and had a normal platelet count.  Ex. 9 at 60-67.  She showed no easy bruising or petechiae, and her energy, activity, and appetite levels had returned to baseline.  *Id.* at 61-67.  The hematologist noted that the ITP "has likely resolved at this time and is unlikely to recur."  *Id.*  A follow-up visit on April 13, 2017, confirmed that A.L. remained "completely free of bleeding symptomology."  *Id.* at 95.  Her energy, activity, and appetite levels returned to baseline.  A.L. had no easy bruising, no fever, and no significant infectious symptomatology.  *Id.*  Her mother was advised that routine follow-

---

[3] Platelet count the morning of September 30, 2016, was 1,000.  Ex. 8 at 215.

up was unnecessary unless the bleeding symptomatology recurred. *Id.* at 100. In follow-up on June 29, 2017, A.L. had a normal platelet count and elevated B cell percentages. Ex. 10 at 9, 93. A pediatric immunologist attributed the mild elevation to A.L.'s "immature immune system," and she noted that "the ITP episode [has] now resolved." No further treatment was recommended. Ex. 10 at 9.

### III.     Legal Standard

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. 42 U.S.C. § 300aa–13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to *consider* the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court *to be bound* by them").

### IV.     Discussion

In order to state a claim under the Vaccine Act, a vacinee must have either:

(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

§300aa-11(c)(1)(D).

### a. Six Month Sequela

"[A]n increased risk of a recurrence without an actual recurrence of a condition is not medically recognized as a 'residual effect' and is not a residual effect within the meaning of § 300aa-11(c)(1)(D)(i) of the Vaccine Act." *Parsley v. Sec'y of Health & Human Servs.*, 08-781V, 2011 WL 2463539, *5 (Fed. Cl. Spec. Mstr., May 27, 2011). It is notable, however, that "residual effects or complications'" and "symptomatic" are not synonymous. *Faup v. Sec'y of Health & Human Servs.*, 12-87V, 2015 WL 443802, *4 (Fed. Cl. Spec. Mstr., January 23, 2015) (one can suffer from a disease without exhibiting any clinical signs thereof). The ongoing need for medication can constitute a "residual effect" of an injury. *Id.*

Respondent argues that A.L. was symptom-free little more than two months after vaccination and therefor did not suffer ITP-related sequela for six months. Resp. Mot. at 3-4 (citing Ex. 9 at 45-51 (normalized platelet count); Ex. 10 at 9). Petitioners argue that A.L. experienced the adverse effects of immune dysfunction, weight gain, and bruising more than six months after vaccination. Pet'rs' Mot. at 34-37. Although A.L. may have been symptom-free within three months of her September 6, 2006 vaccinations, the undersigned reviews whether her medical records establish any "residual effect or complication" lasting six months or more.

### i. Weight Gain

Petitioners argue that A.L. experienced weight gain directly attributable to the steroid treatment she received for ITP. Pet'rs' Mot. at 35-36. Petitioners outline that A.L. weighed 10.0 kilograms on the date of vaccination (September 6, 2016, 15 months old), and gained weight incrementally, reaching 12.25 kilograms on April 17, 2017 (22 months old). Pet'rs' Mot. 35-36 (internal citations omitted). Petitioners state this weight gain is a residual effect of A.L.'s ITP treatment.

A.L.'s records note "increased appetite" and "face swelling" due to steroids on November 1, 2016 (Ex. 9 at 11, 30), but it is not clear that her increasing weight was related to the steroid therapy she completed on November 6, 2016 (Ex. 9 at 46). Petitioners point to A.L.'s weight gain in the five months following the completion of her ITP treatment. Pet'rs' Mot. at 36. Yet, A.L.'s "increased appetite" had resolved by her November 21, 2016 hematology appointment. Ex. 9 at 45.

A.L.'s records in the months following the completion of steroid treatment also show incremental growth. On December 30, 2016, during an appointment with Dr. Amanda Grimes at the Hematology Center of Texas Children's Hospital, A.L. measured 32.48 inches tall and weighed 26 pounds, 10.8 ounces. Ex. 9 at 58. A.L. charted in the 88th percentile for weight, 59th percentile for height, and had a BMI of 17.78. *Id.* At a follow-up appointment with Dr. Grimes on April 13, 2017, A.L. measured 33.39 inches tall and weighed 26 pounds, 14.3 ounces. Ex. 9 at 88. A.L. charted in the 77th

percentile for weight, 46th percentile for height, and had a BMI of 16.97.  *Id.*[4]  On June 29, 2017, A.L. was seen by Dr. Lisa Forbes at Texas Children's Hospital and measured over 34 inches tall and weighed 28 pounds.  Ex. 10 at 3.  A.L. charted in the 63rd percentile for weight, 65th percentile for height, and had a BMI of 16.66. Id. at 3-4.  Overall, A.L.'s records do not indicate her treating physicians were concerned about her weight or growth.

Petitioners provided an article on corticosteroid treatment of ITP as support for their position that A.L.'s weight gain is a known adverse effect of steroid treatment.  Ex. 19.[5]  While the article mentions weight gain as an adverse effect of steroid treatment, it does not specify whether weight gain could continue after completed treatment.  Nor does it address the nuances of distinguishing "adverse effect" weight gain from normal growth throughout the second year of life.  Absent additional information, the undersigned cannot determine whether A.L.'s increasing weight was an adverse effect of her ITP treatment.

### ii.  Immune Dysfunction

Likewise, petitioners' argument that A.L. experienced immune disfunction for more than six months after vaccination is not persuasive.  Petitioners argue A.L. was diagnosed with T-Cell immunodeficiency during treatment of her ITP, and that her immune system remained "abnormal" for more than six months after vaccination.  In particular, petitioners cite to a note by Dr. Lisa Forbes created on June 29, 2017, during a follow up appointment:

> Will recheck B cell subsets today. If trending toward normal the mild elevation is likely due to the immature immune system at her age and new B cell differentiation following the ITP episode now resolved . . . If the level continues to increase there will be concern for immune dysfunction with potential for recurrence of autoimmune disease . . . We discussed this plan at length with mom and dad. They understood and will await the results and next steps for follow up.

Ex. 10 at 9 (internal medical coding omitted); Pet'rs' Mot. at 35 (incorrectly citing Ex. 16 at 46).  This note discusses what steps are to be taken dependent on whether the bloodwork ordered that day showed signs of immunodeficiency.  Ex. 10 at 9.  Yet, the results were "good," A.L.'s next follow up appointment was canceled, and no further treatment was ordered.  Ex. 10 at 8-9; Ex. 12 at 2.  Thus, the undersigned finds that

---

[4] At a chiropractic appointment on April 17, 2017, A.L. measured 31 inches tall, weighed 27 pounds, and "overweight" was noted as a symptom.  Ex. 16 at 46.  This record appears inconsistent with A.L.'s other contemporaneously recorded height measurements.  A.L.'s other records do not identify her as overweight at this time.

[5] David Garcia, MD, *Corticosteroids for ITP: A Comparison of Two* Approaches, The Hematologist: Diffusion, March 25, 2016 (http://www.hematology.org/TheHematologist/Diffusion/5373/aspx).

A.L. did not suffer immune dysfunction or dysregulation persisting for more than six months after her September 6, 2016 vaccinations.

### iii. Continued Bruising

Lastly, petitioners argue that A.L. suffered continued ITP-related bruising more than six months after vaccination. Pet'rs' Mot. at 37. Petitioners cite to A.L.'s immunology records for support of their position. *Id.* (citing Ex. 10 at 1). During a June 29, 2017 visit to Dr. Forbes, the history notes that "mother feels that patient is still bruising easier than other children" and bruising is noted on A.L.'s left cheek and left ear pinna. Ex. 10 at 1, 4. Dr. Forbes ordered a B Cell Subset Panel which returned normal results. Ex. 10 at 8-9. Dr. Forbes' office later contacted A.L.'s mother to cancel her September 2017 follow-up appointment after review of the ordered lab was normal. Ex. 12 at 2. A.L.'s treating immunologist did not attribute any June 29, 2017 bruising to A.L.s' previous ITP diagnosis. The undersigned declines to as well.

Thus, the undersigned finds that petitioners have not established by preponderant evidence that A.L. suffered residual effects of her ITP for six months after her vaccination.

### b. Surgical Intervention

The parties dispute whether the bone marrow aspiration and biopsy that A.L. underwent constitutes a "surgical intervention" as set forth in the Vaccine Act. 42 U.S.C. § 300aa-11(c)(1)(D)(iii). There is no definition of "surgical intervention" within the Vaccine Act. *See* §300aa-33 (Definitions). Nor is there any Federal Circuit decision interpreting that term. As described in prior decisions by special masters, the "surgical intervention" language was added to the Vaccine Act to allow for recovery for intussusception, which often requires surgery but does not typically persist for six months. *Spooner,* 2014 WL 504728; *Stavridis v. Sec'y of Health & Human Servs.*, No. 07-261V, 2009 WL 3837479 (Fed. Cl. Spec. Mstr. Oct. 29, 2009); *Ivanchuk*, 2015 WL 6157016.

In *Spooner*, the special master interpreted surgical intervention as "the treatment of a disease, injury and deformity with instruments or by the hands of a surgeon to improve health or alter the course of a disease." 2014 WL 504278, *10. In that case, the special master based his definition of surgical intervention on entries from *Dorland's Illustrated Medical Dictionary* (29th Edition). *Id.* He noted that the Federal Circuit has approved of the use of medical dictionaries to define statutory medical terms. *Id.* (citing *Abbot v. Sec'y of Health & Human Servs.*, 19 F.3d 39 (Fed. Cir. 1994)). Utilizing the above definition, the special master determined that a lumbar puncture conducted under general anesthesia was surgical in nature, but did not constitute an "intervention," because it was diagnostic and not necessary for treatment. *Id.* at 12. Conversely, the special master determined that IVIG, though for treatment, was not surgical in nature.

7

*Id.* The undersigned agrees with the definition of surgical intervention identified in *Spooner*.[6]

Here, respondent, argues for a statutory interpretation that looks beyond medical dictionary definitions of "surgical intervention" to the Congressional intent of the language. Resp. Mot. at 5. While "surgical intervention" may be a term of art adopted by Congress, respondent has not presented an argument that the term fails to be defined "by reference to the art or science to which [it is] appropriate.'" *Spooner,* 2014 WL 504728, at *10 (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 201 (1974) (quoting *Greenleaf v. Goodrich,* 101 U.S. 278, 284 (1880)). Without a reason to set aside the common, medically specific, definition of "surgical intervention," the undersigned does not agree that the statutory language is sufficiently ambiguous to allow consideration of Congressional intent. *Hellebrand v. Sec'y of Health & Human Servs.*, 999 F.2d 1565, 1569 (Fed. Cir. 1993) (citing *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 788 (Fed. Cir.), *cert. denied*, 488 U.S. 943 (citations omitted) (It is a "general rule of statutory construction that where Congress has clearly stated its intent in the language of a statute, a court should not inquire further.")). Had respondent justified consideration of the legislative history, the undersigned still finds the definition of surgical intervention set forth in *Spooner* to be more persuasive, which also includes an analysis of Congressional intent. *Spooner,* 2014 WL 504728, at *11.

In this case, the undersigned finds preponderant evidence that A.L. underwent a surgical procedure. In order to perform the bone marrow aspiration and biopsy, A.L. was placed under general anesthesia and the procedure was performed by a physician. Ex. 4 at 22; Ex. 1 at 13; Ex. 2 at 204. A preoperative checklist was completed. Ex. 4 at 72-83. A.L.'s mother signed a consent for a surgical procedure.[7] A.L. was monitored by the Post Anesthesia Care Unit ("PACU") following the procedure. Ex. 4 at 81.

The undersigned also finds that A.L.'s bone marrow aspiration and biopsy constituted a surgical intervention. Although a bone marrow biopsy is, typically, not a treatment that alters the course of a disease or condition, the facts of this case present an atypical situation. Although A.L. presented with symptoms consistent with ITP, she

---

[6] In the earlier *Stavridis* decision, the chief special master rejected essentially the same definition adopted in *Spooner*, contending that it was overly broad. 2009 WL 3837479, *4. In that case, the chief special master accepted the unrebutted opinion of respondent's medical expert that steroid treatments and blood transfusions should not be understood as surgical interventions. *Id.* at *6. That decision did acknowledge, however, that there is a "large gray area between treatments that are definitely considered 'surgical intervention' and those that are not." *Id.* at *6. In this case, the medical records offer sufficient detail to address this issue without the need for further medical opinion.

[7] Notably, the authorization form used in A.L's case is titled "Authorization For And Consent To Surgery Or Special Diagnostic Or Therapeutic Procedures." Ex. 4 at 658. Dr. James Harper reviewed the procedure with A.L.'s mother, answered her questions about post-operative pain, and obtained her consent. Ex. 4 at 53. Consent for the bone marrow aspiration procedure is noted elsewhere in the record including within in the pre-operative checklist. Ex. 4 at 74 ("Pre-op" checklist), 106. A.L.'s mother also provided consent for intravenous anesthesia. Ex. 4 at 80.

did not respond to initial therapies including IVIG.  Ex. 4 at 16.  A.L.'s treating physician, Dr. James Harper, ordered and performed the bone marrow aspiration and biopsy to rule out bone marrow disorders for which steroid treatment would be contraindicated.  *Id.* at 21, 41.  The steroid treatment ordered following A.L.'s bone marrow biopsy results eventually improved her ITP condition.  *Id.* at 11-12; Ex. 9 at 45-46.  Because the medical record explicitly indicates that the bone marrow biopsy was required in order to institute treatment rather than diagnose A.L.'s condition, the bone marrow biopsy was a necessary and integral part of the overall treatment protocol that ultimately cured A.L.'s ITP.  *Ivanchuk*, 2015 WL 6157016, at *2 (bone marrow aspiration can qualify as a "surgical intervention" under the Vaccine Act).

Thus, the undersigned finds that petitioners have provided preponderant evidence that A.L.'s alleged vaccine injury resulted in inpatient hospitalization and surgical intervention in accordance with the Vaccine Act.  42 U.S.C. § 300aa-11(c)(1)(D)(iii).  This finding is narrowly tailored to the facts and circumstances presented by this case and is *not* a finding that bone marrow biopsy constitutes a surgical intervention in all circumstances.

## V. Conclusion

For all these reasons, I find that petitioners have established A.L.'s alleged injury meets the severity requirement described in §300aa-11(c)(1)(D) of the Vaccine Act.

**s/ Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master